Donna JONES, Plaintiff,

v.

**SMITHKLINE BEECHAM CORPO-
RATION d/b/a Glaxo Smith
Kline, Defendant.**

No. 02–CV–1428.

United States District Court,
N.D. New York.

March 17, 2004.

Berger & Ducharme, LLP, Clifton Park, NY, Attorneys for Plaintiff, Joseph C. Berger, Esq.

Schoeman, Updike & Kaufman, LLP, New York City, Attorneys for Defendant, Beth L. Kaufman, Esq., of Counsel.

*MEMORANDUM–DECISION and ORDER*

McAVOY, Senior District Judge.

## I. INTRODUCTION

Plaintiff Donna Jones ("Plaintiff") commenced the instant action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"), and the New York Human Rights Law, N.Y. Exec. Law § 296 ("HRL"), arising out of her employment with Defendant SmithKline Beecham Corporation d/b/a Glaxo Smith Kline ("GSK"). Currently before the Court is Defendant's motion for summary judgment pursuant to Fed. R. Civ. P 56 seeking dismissal of the Complaint in its entirety. Plaintiff has cross-moved for leave to file an amended complaint alleging a claim of constructive discharge. This latter motion was initially referred to the assigned magistrate judge for resolution, but is addressed herein.

## II. FACTS

Defendant is in the business of developing, manufacturing and selling prescription pharmaceutical and biologic products and consumer healthcare products. In 1989, Plaintiff began working for Defendant as a sales representative.[1] At the time she was hired, Plaintiff was 43 years of age. For the first nine years of Plaintiff's employment with Defendant, Defendant employed two types of sales representatives—(1) hospital representatives; and (2) field representatives. Hospital representatives targeted hospitals and physicians within the hospitals. Field representatives focused on non-institutional buyers, such as private physicians. In her position, Plaintiff primarily sold to teaching hospitals in

---

1. Plaintiff actually was hired by Defendant's predecessor, Glaxo Wellcome.

the Albany and Cooperstown, New York areas.

In approximately April 1993, Plaintiff's then supervisor, Richard Jeffries, accompanied her on certain sales call. Jeffries disapproved of certain of Plaintiff's tactics, which he stated could cause a client to feel uncomfortable. Specifically, Jeffries believed that Plaintiff was standing too close to the physician. Accordingly, Jeffries issued a set of written objectives for Plaintiff to meet. Plaintiff denies that she acted inappropriately.[2] In support of her claim, Plaintiff submits the affidavit of the physician to whom she was selling. The physician states that he did not find Plaintiff to have acted inappropriately in any way.

■ Jeffries also claimed to have received several complaints regarding some of Plaintiff's behavior while on sales calls. Def.'s SMF at ¶¶ 20–22. Such behavior included lecturing customers on AIDS,[3] failing to use company sales tactics, using unprofessional language in the vicinity of medical staff and patients, using religious expressions with customers, encouraging clients to listen to certain religious radio stations, and failing to comply with the company's call reporting procedures and other company policies. *See id;* Schwartz Aff. at Ex. 1. Accordingly, Jeffries issued Plaintiff a written warning and placed her on a sixty-day probation period. *Id.*[4]

In December 1993, Plaintiff contacted an attorney who wrote a letter to Defendant claiming that Jeffries' treatment of Plaintiff was a form of gender-based discrimination. Jones Aff. at ¶ 14. In early 1994, Plaintiff was reassigned to another district manager. *Id.* at ¶ 15.

---

2. Plaintiff claims that "[t]his is a charge which I believe would never be made against a male sales representative." Jones Aff. at ¶ 11.

3. Defendant was not marketing any AIDS-related products at that time.

4. In her responsive statement of material facts required under N.D.N.Y.L.R. 7.1(a)(3), Plaintiff denies many of Defendant's factual assertions. However, Plaintiff fails to provide any citations to the record in support of her denials. In other circumstances, Plaintiff fails to deny the entirety of Defendant's statement of fact. Rule 7.1(a)(3) very clearly provides that:

> [t]he opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. **Each denial shall set forth a specific citation to the record where the factual issue arises**.... *Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

(bold faced emphasis added, underlining in original).

The Local Rules require the litigant, not the Court, to sift through the record and bring to the Court's attention the pertinent information. *See Amnesty America v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir. 2002)("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") (citations omitted); *Monahan v. New York City Dep't of Corrections,* 214 F.3d 275, 291 (2d Cir.2000) (Noting that the local rules are "designed to place the responsibility on the parties to clarify the elements of the substantive law which remain at issue because they turn on contested facts.... While the trial court has discretion to conduct an assiduous review of the record in an effort to weigh the propriety of granting a summary judgment motion, it is not required to consider what the parties fail to point out.") (internal quotations and citations omitted). In light of the foregoing, where Plaintiff has failed to provide specific references to the record in support of her denials or has otherwise failed to completely deny Defendant's assertions of fact, those assertions will be taken as true.

In 1997, a work conflict developed between Plaintiff and a sales representative from another district, Kelly Fisher. *Id.* at ¶ 17. Plaintiff believed that Fisher was calling on accounts in Plaintiff's territory. *Id.* Plaintiff claims that she attempted to resolve the matter with Fisher, but that she was not able to do so and that Fisher became increasingly hostile and belligerent towards her. *Id.* at ¶ 19. Plaintiff further states that Fisher's brother and one of her friends, both of whom worked for Defendant, also began to treat Plaintiff in a rude and offensive manner. *Id.* at ¶ 20. Sometime in 1997, Plaintiff experienced several flat tires on her company car. *Id.* at ¶ 22. Plaintiff was suspicious that the flat tires were related to her problems with Fisher. *Id.*

In 1998, Plaintiff complained to her then manager, Maury Crawford, about Fisher. *Id.* at ¶ 26. Crawford was unable to resolve the matter with Fisher's manager. *Id.* Plaintiff then requested that Regional Vice President Jay Schwartz assist in resolving the matter. *Id.* at ¶ 27. In May 1998, Schwartz met with both Plaintiff and Fisher.[5] *Id.* at ¶ 28. Schwartz counseled Fisher and Plaintiff on better communication skills. Def.'s SMF at ¶ 25. Plaintiff further contends that "Mr. Schwartz brought up the issue of my 'turning in' Mr. Richard Jeffries, which had occurred some five years previously. I felt that this reference was completely inappropriate and delivered a clear message to Ms. Fisher that I was a trouble maker and obviously the one to blame for any problems." Jones Aff. at ¶¶ 29–30.

During 1997—1998, Plaintiff was instrumental in setting up a health care related web site in partnership with the New York State Department of Aging. *Id.* at ¶ 40. "When the work on the web site was to be expanded, [Plaintiff] was abruptly told that [she] would no longer be in charge of [the] project and that it was being turned over to a male by the name of Jerry Malloy." *Id.* at ¶ 41. Plaintiff also maintains that "[d]uring this period when [she] received company sales awards, they were not announced at company meetings as were other employees' awards." *Id.* at ¶ 43.

Plaintiff alleges that in February 1999, Colleen Ziegler, a district sales manager, overheard Schwartz saying that he was looking for a way to "get rid of Donna Jones." *Id.* at ¶ 35; Ziegler Aff. at ¶ 8. Plaintiff contends that her district manager, David Mosher, made similar comments. Jones Aff. at ¶ 36; Ziegler Aff. at ¶ 10.

In July 1999, Plaintiff filed a written complaint to Defendant's human relations department. In the complaint, Plaintiff claimed to be the victim of age and gender-based discrimination. Pl.'s Ex. 4. In December 1998, Plaintiff received her 1998 performance review. Jones Aff. at ¶ 37. Although Plaintiff expected the highest rating, she "only received an adequate rating." Jones Aff. at ¶¶ 37–38. On February 2000, Defendant responded to Plaintiff's complaint stating that, after investigation, her complaints were unfounded. Pl.'s Ex. 5.

In early 2000, Plaintiff was assigned to a new district manager, Dan Fitzpatrick, and a new regional vice president, Joseph Abdalla. Jones Aff. at ¶. 51. In the Spring of 2000, Plaintiff spoke to Fitzpatrick about being accepted into a particular management training program. *Id.* at ¶ 53. Fitzpatrick and Abdalla met "to discuss a plan on how best to talk with Donna Jones regarding her interest in the ... program." Pl.'s Ex. 7. Plaintiff was not accepted into the program. *Id.*

Plaintiff further claims that, throughout 2000, Fitzpatrick, Mosher and Abdalla openly stated at managers' meetings that

---

5. Fisher is alleged to have been in her late 20s or early 30s at the time. *Id.* at ¶ 28.

they wanted to document a case against Plaintiff so they could get rid of her. Jones Aff. at ¶ 55; Borgus Aff. at ¶ 7. At some of these same managers' meetings, another district sales manager, Joseph Burczak, is purported to have stated that he was adept at getting rid of "old deadwood" employees. Jones Aff. at ¶ 56; Borgus Aff. at ¶ 8. Abdalla is claimed to have stated that "Glaxo isn't a home for retired workers." Pl.'s Ex. 9.[6]

At a 2001 meeting, Mosher is claimed to have stated that "[t]here is no way I am going to let [Plaintiff] see the field doctors." Borgus Aff. at ¶ 11. In 2001, GSK restructured its sales department. According to Plaintiff, "[t]he intent of this change was to have the former hospital reps be integrated into selling to field locations outside of hospitals." Jones Aff. at ¶ 59. Under the change, sales representatives were assigned to one of two different sales plans: (1) 80% direct sales from hospitals and 20% field sales ("80/20"); or (2) 50% direct sales from hospitals and 50% field sales ("50/50"). Id. at ¶ 61. Plaintiff was placed in the 80/20 plan. Two other males were placed in the 80/20 plan. Pl.'s Ex. 10. Three males were placed in the 50/50 plan. Id. Plaintiff contends that her placement in the 80/20 plan is the effectuation of Mosher's claimed intent not to allow her to see the field doctors. Jones Aff. at ¶. 65. According to Defendant, "GSK's home office, not plaintiff's supervisor, ... assigned incentive weightings according to market dynamics for employees with similar job responsibilities and gender was not a factor." Def.'s SMF at ¶ 48.[7]

In November 2001, Defendant held a managers' meeting during which there was discussion concerning a new form that was used to document managers' meetings with sales representatives. Jones Aff. at ¶ 72. Fitzpatrick, Mosher and Abdalla discussed the possibility of not using the new form with Plaintiff because "they were worried about comments which she might write on the form and how they 'didn't want to start all over' in documenting a case for termination of Ms. Jones." Borgus Aff. at ¶ 13.

In January 2002, Plaintiff's district was assigned to a new region that was headed by Schwartz. Defendant apparently received complaints from Plaintiff's co-workers that she was making derogatory comments about other employees. Def.'s SMF at ¶ 27. Schwartz directed Defendant's human resources department to investigate. Id. After investigation, Defendant determined that Plaintiff had disrupted the work environment. Id. at ¶ 29. Accordingly, Plaintiff was placed on a 30–day warning period. Id. The warning was lifted on May 29, 2002. Id. at ¶ 30.

In March 2002, Plaintiff took a leave of absence. She returned to work in April 2002. At that time, Mosher assigned two sale representatives, both of whom are purported to have been in their early 30s, to call on some of Plaintiff's hospital clients. Jones Aff. at ¶ 83. In March 2003, Plaintiff again went out on leave. Plaintiff's company-provided short-term disability benefits ran out on September 26, 2003. Plaintiff did not return to work. On September 26, 2003, Defendant terminated Plaintiff's employment.

## III. STANDARD OF REVIEW

■ It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most

---

6. This statement is taken from the deposition transcript of Tom Scofield in a different case.

7. In her responsive SMF, Plaintiff denies this allegation, but does not point to any evidence tending to support her denial. Accordingly, the facts in this statement are deemed admitted. N.D.N.Y.L.R. 7.1(a)(3).

favorable to the non-moving party, *see Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir.1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the movant is able to establish a prima facie basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525–26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998). With this standard in mind, the Court will address the defendant's motion.

## IV. DISCUSSION

### a. Title VII and ADEA

Plaintiff contends that she was the victim of a gender and/or age-based hostile work environment. Plaintiff also asserts claims of disparate treatment on account of her age and gender. In support of all of these claims, Plaintiff argues that she was humiliated by Schwartz in 1998; Schwartz failed to address Plaintiff's conflict with Fisher; she was the victim of several unexplained slashings of the tires on her car; in 1999, Schwartz and Mosher openly admitted their desire to get rid of Plaintiff; she was taken off of the web site project; in December 1998, she received an adequate rating (as opposed to an exemplary rating) on her performance review; during the period of 1997–1998, the sales awards that Plaintiff earned were not announced at company meetings; her complaint of discrimination was not properly investigated; in 2000, Abdalla and Fitzpatrick indicated a desire to get rid of Plaintiff; Burczak stated at a manager's meeting that he knew how to get rid of "old deadwood" employees; Abdalla stated that Defendant is not a place for retired workers; Defendant devised a "plan" on how to handle Plaintiff's request to participate in a certain training program; Mosher stated that he would not let Plaintiff get near certain field customers; Plaintiff was placed on the 80/20 sales plan; Plaintiff was the target of rude and demeaning treatment by colleagues and managers at meetings; Mosher asked certain younger sales representatives to call on some of Plaintiff's customers without proper coordination; and Defendant issued a verbal warning to Plaintiff.

### 1. *Hostile Work Environment*

Plaintiff first claims that the foregoing is evidence of an age-based or gender-based hostile work environment.

As the Second Circuit has explained,

In order to prevail on a hostile work environment claim under Title VII, a plaintiff must show that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working

environment.... This test has objective and subjective elements: the misconduct must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive. Among the factors to consider when determining whether an environment is sufficiently hostile are the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. In determining whether a hostile environment exists, we must look at the totality of the circumstances. As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive. While the standard for establishing a hostile work environment is high, we have repeatedly cautioned against setting the bar too high, noting that while a mild, isolated incident does not make a work environment hostile, the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse. The environment need not be unendurable or intolerable. Nor must the victim's psychological well-being be damaged. In short, the fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious cases.

*Terry v. Ashcroft*, 336 F.3d 128, 147–48 (2d Cir.2003) (internal citations, quotations and alterations omitted). Of course, to be actionable, any offensive conduct must be because of a protected characteristic, such as age or gender. *See Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir.2002).

### 2. *Hostile Work Environment—Was the Alleged Conduct Sufficiently Severe or Pervasive?*

■ As an initial matter, considering all the evidence in its totality, the Court finds that the complained of conduct is neither sufficiently severe, nor sufficiently pervasive to constitute a hostile work environment. Plaintiff points to isolated and sporadic events that occurred primarily during that last five or six years of her fifteen years of employment with Defendant. There is nothing particularly hostile or abusive about the conduct to which Plaintiff was allegedly subjected. Plaintiff's evidence falls far short of the type of conduct that the Second Circuit has held sufficient to establish a hostile work environment. In fact, the Second Circuit has found far more egregious conduct to be insufficient as a matter of law to establish a hostile work environment. *See Alfano*, 294 F.3d at 379 (citing cases).

Most of Plaintiff's allegations are not the type of conduct typically considered to constitute a hostile work environment and can be classified as minor inconveniences or annoyances or otherwise completely irrelevant to a claim of unlawful discrimination. For example, the failure to address the conflict between Plaintiff and Fisher is normally not the type of conduct attributable to a hostile work environment. This is simply a disagreement with the way management handled a particular situation. In any event, it was a discrete incident that does not appear to have any connection with Plaintiff's other allegations. With respect to the tire slashings, Plaintiff has no evidence that Defendant or any of its employees had anything to do with that and to conclude otherwise would be to accept pure conjecture. Plaintiff also points out that her supervisors made comments about wanting to get rid of her. While such comments may be unpleasant

and distressing to an employee to hear, in an at-will employment situation, absent evidence of some unlawful discrimination behind the comments, they are not actionable.[8] In any event, Plaintiff identified only two such instances. Defendant's failure to openly announce Plaintiff's sales awards is not particularly severe, but, at most, is a trivial matter over which Plaintiff may have been upset. Plaintiff also contends that her managers devised a "plan" to handle her request to participate in a manager's training course. It is unclear how this is discriminatory or how it could be upsetting. To the extent it is upsetting to Plaintiff, it is not particularly upsetting from an objective standpoint and can only be characterized as minor.

Next, being the subject of rude and demeaning treatment by managers and colleagues certainly can be annoying. However, Plaintiff failed to specify any such rude and demeaning treatment or the severity and/or pervasiveness of any such treatment. Receiving a verbal warning also can be upsetting, but the warning alleged by Plaintiff is an isolated event unrelated to any of the other conduct about which she complains. In fact, all the events cited by Plaintiff appear to be largely isolated, unrelated, and to have been committed by different persons. Thus, even considering the evidence in its totality, there is insufficient evidence upon which a fair-minded trier of fact could reasonably conclude that Plaintiff was subjected to harassment that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment. Accordingly, the hostile work environment claims must be dismissed.

### 3. Disparate Treatment Claims— Whether Plaintiff Suffered Any Adverse Employment Action

■ To establish a claim of disparate treatment, Plaintiff must demonstrate that: (1) she is a member of the protected class (age for her ADEA claim; female for her Title VII claim); (2) she was qualified for the position; (3) she was subjected to an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of unlawful discrimination. *See Terry,* 336 F.3d at 138. Under the familiar *McDonnell Douglas* burden shifting scheme, *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), if Plaintiff establishes a prima facie case, there is a presumption of unlawful discrimination. The burden then shifts to the employer to proffer a legitimate, non-discriminatory reason for its action. If the employer satisfies this burden, any presumptions of discrimination are erased and Plaintiff is left to submit sufficient evidence from which a fair-minded trier of fact could reasonably conclude that "the defendant's employment decision was more likely than not based in whole or in part on discrimination.' " *Terry,* 336 F.3d at 138 (quoting *Stern v. Trustees of Columbia Univ. in City of New York,* 131 F.3d 305, 312 (2d Cir.1997)).

Plaintiff identifies three purported adverse employment actions: (1) a loss of bonuses due to a discriminatory sales plan; (2) lack of opportunity for promotion; and (3) constructive discharge. *See* Pl.'s Mem. of Law at ¶ 17.

As the Second Circuit has stated

A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and

---

**8.** As will be discussed *infra,* Plaintiff also has failed to demonstrate that any of the alleged

conduct was motivated by Plaintiff's gender and/or age.

conditions of employment. To be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation. *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir.2000) (internal quotation, citations and alterations omitted).

### a. The 80/20 Sales Plan

■ Here, there is no evidence that placing Plaintiff in the 80/20 sales plan constituted an adverse employment action. Although Plaintiff claims that she lost bonuses, she provides no evidence in support thereof. Defendant, on the other hand, presented undisputed evidence that Plaintiff received pay increases at least annually, that her sales territory never changed, that Defendant's changes to its sales structure had little effect on Plaintiff, and that she always had the teaching hospitals in the Albany and Cooperstown areas. Def.'s SMF at ¶¶ 8–9, 14–15. It must be remembered that, at all times prior to the new sales plan, Plaintiff primarily worked with the hospitals, not the "field" doctors. Thus, the new sales plan did not effectuate much of a change for Plaintiff, except that she was now afforded the opportunity to make some field sales. Other than making the unsubstantiated allegation that other salespeople had higher sales than she, Plaintiff does not offer any evidence how the new sales plan was materially adverse. For example, there is no evidence that the new sales plan amounted to a demotion, a decrease in salary or benefits, a less distinguished title, was less prestigious, involved significantly diminished responsibilities, involved a material change in duties, precluded Plaintiff from obtaining significant bonus levels, or anything else materially adverse. *See Sanders v. New York City Human Resources Admin.*, 361 F.3d 749, 755–57 (2d Cir.2004). Accordingly, the Court finds that placing Plaintiff in the 80/20 sales plan did not constitute an adverse employment action.

### b. Lack of Promotional Opportunities

■ Plaintiff also claims that she was denied promotional opportunities in June 2000. *See* Pl.'s Ex. 7. Specifically, Plaintiff claims that she was not permitted to participate in a certain management training program. *Id.* Under Title VII and the ADEA, this claim is time-barred because it is a discrete act of alleged discrimination that occurred more than 300 days before the filing of the EEOC charge on June 21, 2002. 42 U.S.C. § 2000e–5(e)(1); *see Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109–15, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). Any other alleged adverse employment actions that occurred before August 25, 2001 (such as, for example, the 1998 performance review) are similarly time-barred.

### c. Constructive Discharge

■ Finally, Plaintiff claims that she was constructively discharged ten months after she filed the Complaint in this action.[9] To establish a constructive discharge, Plaintiff must demonstrate that her employer acted deliberately to "make [ ][her] working conditions so intolerable that [she] is forced into an involuntary

---

**9.** Plaintiff has moved for leave to file an amended complaint alleging constructive discharge. This motion is currently pending before the magistrate judge. For reasons of judicial economy, the Court will treat that claim as if it was included in the operative pleading.

resignation." *Lopez v. S.B. Thomas,* 831 F.2d 1184, 1188 (2d Cir.1987). "[W]orking conditions are intolerable when, viewed as a whole, they are 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Terry,* 336 F.3d at 152 (quoting *Chertkova v. Connecticut Gen. Life Ins. Co.,* 92 F.3d 81, 89 (2d Cir.1996)). For the reasons previously discussed with respect to the hostile work environment claim, no fair-minded trier of fact could reasonably conclude that Defendant intentionally made Plaintiff's working conditions so intolerable that she was forced to resign involuntarily. Although Plaintiff may have suffered panic attacks and anxiety, from an objective standpoint, there is insufficient evidence in the record that Plaintiff's working conditions were so intolerable such that an ordinary person would feel compelled to resign.[10] Thus, there was no constructive discharge and it would be futile for Plaintiff to amend her Complaint to add allegations of constructive discharge.

**4. *Hostile Work Environment and Disparate Treatment Claims—Did the Conduct Take Place Under Circumstances Giving Rise to an Inference of Discrimination***

Assuming Defendant's conduct could be considered sufficiently severe and/or pervasive (which it cannot) and that Plaintiff did suffer adverse employment actions (which she did not), there is insufficient evidence from which a fair-minded trier of fact could reasonably conclude that any such conduct was based on Plaintiff's gender or age. Most of Plaintiff's evidence is comprised of facially-neutral incidents with which Plaintiff was displeased. "Facially neutral incidents may be included, of course, among the 'totality of the circumstances' that courts consider in any hostile work environment claim, so long as a reasonable factfinder could conclude that they were, in fact, based on sex [or age]. But this requires some circumstantial or other basis for inferring that incidents sex [or age]neutral on their face were in fact discriminatory." *Alfano,* 294 F.3d at 378. With respect to the discrete instances, there too, Plaintiff must provide some basis upon which the trier of fact could reasonably infer that it was motivated by unlawful discrimination.

Here, there is no basis upon which a fair-minded trier of fact could reasonably conclude that the instances alleged by Plaintiff were based upon her gender and/or age. The closest Plaintiff comes to demonstrating evidence of gender-based or age-based conduct are her allegations that Schwartz humiliated her in front of Fisher by mentioning that Plaintiff "turned in" Jeffries for sex discrimination; Plaintiff was given the 80/20 sales plan while certain male employees were placed on the 50/50 plan; Plaintiff was removed from the internet project and replaced by a male employee;[11] Burczak discussed getting rid of "old deadwood" employees; Abdalla stated that Defendant was not a place for retired workers; and Mosher directed younger sales representatives to call on some of Plaintiff's customers.[12]

> As the Second Circuit has warned,
> Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh,

---

**10.** Of course, Plaintiff did not resign. She left on short-term disability due to her mental health. When she failed to return to work when her short-term disability coverage ended, Defendant terminated her employment.

**11.** To the extent the foregoing incidents could constitute discrete acts of discrimination, they are time-barred.

**12.** As previously discussed, none of Plaintiff's allegations are sufficiently severe or pervasive.

unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals. *See, e.g., Byrnie v. Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir.2001) ("[The court's] role is to prevent unlawful hiring practices, not to act as a superpersonnel department that second guesses employers' business judgments.") (quoting *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir.1999) (internal quotation marks omitted)); *see also Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir.2002) (federal courts "are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision") (internal quotation marks omitted). Moreover, many personnel decisions can be ascribed to discrimination no matter what the supervisor does. Thus, it is easy to claim animus whether a supervisor resorts to counseling (if this is seen as a form of discipline) or not (if lack of guidance is deemed to set up an employee for harsher discipline).

*Alfano*, 294 F.3d at 377–78.

The evidence in the record is that, although Schwartz may have brought up her complaint against Jeffries, there is no indication, direct or circumstantial, that he brought up the complaint because of Plaintiff's age or gender. At the particular meeting when the issue came up, Schwartz was counseling two female employees regarding communication issues. No inference of discrimination can be made from this incident. Moreover, there is no other hostile conduct attributable to Schwartz. There is simply no indication that Schwartz acted because of Plaintiff's gender or age.

 There is similarly a lacking of any link between Plaintiff's age or gender to her removal form the internet project. It is easy to jump to the conclusion that there was gender-based discrimination where a female who was working on a project was replaced by a male. If that fact alone were sufficient to withstand summary judgment, then the Courts would be flooded with discrimination claims. There must be something more, however, suggesting that Plaintiff was removed from the position because she was a female. Here, there is nothing more. Defendant has submitted evidence that it selected a male employee who had particular computer expertise to work on the internet project. Mosher Aff. at ¶ 9. Plaintiff has not cast any doubt on this explanation or offered any other evidence tending to suggest that Plaintiff was removed from the internet project because of her gender. Thus, the mere fact that Plaintiff, a female, was taken off the job and replaced by a male, does not give rise to an inference of discrimination. Moreover, there is no indication that this constituted an adverse employment action or that it was in any way related to an adverse employment action.

Plaintiff next points to the 80/20 sales plan that she was given. The evidence in the record is that two other males were placed in the 80/20 plan and three males were placed in the 50/50 plan. Pl.'s Ex. 10. Based on the facts that two other males were placed in the 80/20 plan, it is difficult to conceive how any inference can be made that Plaintiff was placed in the 80/20 on account of her gender.[13] More-

---

**13.** There is no evidence in the record concerning these employees' ages and, thus, no evidence suggesting age-based discrimination.

over, the undisputed evidence in the record is that none of Plaintiff's managers or supervisors or any other persons claimed to be involved in any hostile work environment or other discriminatory conduct were involved in the decision to place Plaintiff in the 80/20 sales plan. As Plaintiff admitted, that decision was made by Defendant's home office based on gender-neutral criteria. Schwartz Aff. at ¶ 14; Def.'s SMF at ¶ 48.[14] Even assuming Plaintiff's supervisors were involved in the assignment of sales plans and further taking Plaintiff's assertion as true that she was not given the 50/50 plan because Mosher refused to permit Plaintiff to see the field doctors, *see* Jones Aff. at ¶ 65, there is no evidence that Mosher's actions were attributable to Plaintiff's gender or age. There is no evidence in the record making it any more likely that Mosher acted on account of Plaintiff's gender or age than for any other reason.

■ In her affidavit, Donna Borgus, a former district sale manager with Defendant, states that:

6. During my time as a District Manager I attended many meetings of sales managers.

7. On at least three separate occasions during this time I heard David Mosher, Dan Fitzpatrick and Regional Vice President, Joseph Abdalla discussing how they wanted to document a case against Donna Jones so that they could get rid of her.

8. I also heard another District Manager, Mr. Joe Burczak, state at these same meetings that he was adept at getting rid of the "old deadwood" employees and that he could advise other managers on how to rid themselves of these types of employees. He joined the discussions mentioned above for this purpose.

A statement about getting rid of "old deadwood" employees could be circumstantial evidence of age discrimination. However, there is no evidence that Burczak was involved in any of the conduct contributing to the alleged hostile work environment or in any adverse employment actions. There also is an absence of any evidence that Plaintiff's supervisors asked for, condoned, or otherwise acted in accordance with Burczak's comments. The motives of a third-party (Burczak) cannot be attributable to Plaintiff's supervisors (Mosher, Fitzpatrick and Abdalla) without some indicia that her supervisors somehow acted pursuant to the motives of that third-party or that Burczak was a top executive responsible for setting corporate policy. *See Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 92 (2d Cir.), *cert. denied,* 534 U.S. 951, 122 S.Ct. 348, 151 L.Ed.2d 263 (2001). Here, there is no such indicia. In any event, any adverse employment action that can be related to comments made in 2000 are time-barred for the reasons previously stated. Further, it is undisputed that Plaintiff was ultimately terminated because she failed to return to work after her leave of absence.

Plaintiff also points to Abdalla's alleged statement that Defendant is not a place for retired workers. Such a statement by a manager could give rise to an inference of age-based discrimination, although the true meaning of any such statement is unclear. Assuming Abdalla made such a statement and that it has a negative connotation with respect to older workers, Plaintiff does not connect it in any way to any alleged adverse employment action. First, it is entirely unclear when any such statement was made. Scofield Dep. at 73 (indicating that the statement was made sometime in the two year period prior to October 2003). Second, as discussed,

14. *See* n. 4, *supra.*

Plaintiff has not identified any adverse employment action.

Plaintiff also alleges that, in or about April 2002, Mosher "began to assign two sales reps in their early 30s, Caroline Potvin and Connie Kinney, to call on some of my hospital clients." Jones Aff. at ¶ 83. Giving Plaintiff's accounts to younger sales representatives could give an appearance of age-based discrimination.[15] Mosher admits that he did ask these two individuals to call upon certain doctors at the Albany Medical Center. Mosher Aff. at ¶ 10. Mosher explains that "I asked Ms. Kinney to call upon a doctor with whom she had developed a long-standing relationship in her prior employment with another pharmaceutical company. Ms. Potvin and Ms. Kinney both called on doctors in AMC along with Ms. Jones." *Id.* This is a legitimate, non-discriminatory explanation. In response, Plaintiff has not cast doubt upon this explanation or otherwise proffered any evidence tending to suggest that this action was taken on account of Plaintiff's age. Plaintiff's allegation that "[she] was convinced that Mr. Mosher was directing these young sales reps to make me look bad in front of the customers in order to force me out of the company so that he could assign my customers to younger sales reps" is conclusory and based upon pure speculation. Plaintiff offers no evidence from which it reasonably may be inferred that Mosher acted on account of Plaintiff's age. Moreover, there is no evidence that Plaintiff suffered any adverse employment action on account of Mosher's actions.

None of the other alleged discriminatory conduct can be linked to any discriminatory motive. For the foregoing reasons, the Court finds that there is no evidence in the record upon which a fair-minded trier of fact could reasonably conclude that Defendant acted on account of Plaintiff's age or gender. Accordingly, Plaintiff's claims for a hostile work environment and for disparate treatment under Title VII and ADEA claims are dismissed.

### 5. *Retaliation Claims*

Plaintiff next contends that she was retaliated against for having: (1) complained of discrimination in 1993; (2) complained of discrimination in 1999; and (3) filed a charge of discrimination with the EEOC in June 2001.

To establish a prima facie case of retaliation, Plaintiff must show that: (1) she engaged in protected activity; (2) Defendant was aware of this activity; (3) Defendant took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity. *Sanders*, 361 F.3d at 754–55.

■ As previously discussed, Plaintiff has failed to demonstrate any timely adverse employment actions. Assuming Plaintiff can demonstrate timely adverse employment actions, she has failed to submit any evidence of a causal connection between her protected activity and any adverse employment actions. Plaintiff was not denied participation in the training program until at least one year after her July 1999 complaint of discrimination. Thus, no inferences can be drawn from the timing of these events. *See Hollander v. Am. Cyanamid Co.*, 895 F.2d 80 (2d Cir. 1990). Plaintiff offers no other evidence tending to suggest that she was not permitted to participate in the training program on account of complaints. In fact, Plaintiff's own exhibit concerning the training program indicates that she was not admitted into the program because she did not have the proper skill sets. Plain-

---

**15.** In light of the fact that there are two other female sales representatives involved in this allegation, no inference of gender-based discrimination can be made.

tiff offers nothing to refute this or to otherwise suggest that her gender or age was the real reason.

■ Similar reasons apply to any claimed adverse employment actions resulting from her 1993 and 2001 complaints of discrimination. Nothing is claimed to have happened as a direct result of the 1993 complaint.[16] To the extent Plaintiff claims that it was the impetus for later actions, any causal connection is too attenuated. *Id.* Plaintiff also is unable to connect her 2001 charge of discrimination filed with the EEOC with any adverse employment action. As previously discussed, putting Plaintiff on the 80/20 sales plan was not an adverse employment action. Plaintiff's termination in 2003 is far too removed in time from the 2001 charge of discrimination to give rise to an inference of retaliation. *Id.* Moreover, the evidence is that Defendant terminated Plaintiff because she did not return to work after a leave of absence. Plaintiff does not refute this.

## V. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED; Plaintiff's cross-motion for leave to file an amended Complaint is DENIED; and the Complaint is DISMISSED IN ITS ENTIRETY. To the extent any of Plaintiff's HRL claims remain, the Court declines to exercise supplemental jurisdiction over any such claims. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

---

16. Although Plaintiff contends that Defendant created a hostile work environment in retaliation for her protected activity, for the reasons previously discussed, there was no such hostile work environment.